# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JULIUS REALTY CORPORATION, a New Jersey corporation,<br><br>Plaintiff,<br><br>v.<br><br>DAWN E. THOMPSON, an individual,<br><br>Defendant. | Case No.:  1:20-cv-04575-ESK-JBD |
| DAWN E. THOMPSON, individually and as trustee of the Dawn Thompson Trust, and DAWN THOMPSON TRUST,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>U.S. EAGLE CORPORATION, JAMES J. WESTPHAL, JR., SCOTT K. WESTPHAL, JJW TRUST, SKW TRUST, and NORRIS McLAUGHLIN, P.A.,<br><br>Third-Party Defendants. | Consolidated Case No.: 20-cv-17262<br><br>**DAWN E. THOMPSON'S ANSWER AND AFFIRMATIVE DEFENSES TO JULIUS REALTY CORPORATION'S THIRD AMENDED COMPLAINT, DAWN E. THOMPSON'S AMENDED COUNTERCLAIMS AND THIRD-PARTY CLAIMS, AND DAWN E. THOMPSON'S, AS TRUSTEE OF THE DAWN THOMPSON TRUST, AND DAWN THOMPSON TRUST'S THIRD-PARTY CLAIMS** |
| DAWN E. THOMPSON, as trustee of the Dawn Thompson Trust, and DAWN THOMPSON TRUST, derivatively on behalf of U.S. EAGLE CORPORATION, and derivatively on behalf of JULIUS REALTY CORPORATION,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>JAMES J. WESTPHAL, JR., and SCOTT K. WESTPHAL,<br><br>Third -Party Defendants. | |

## ANSWER TO THIRD AMENDED COMPLAINT

Defendant Dawn E. Thompson ("Thompson"), by and through her attorneys, Haynes and Boone, LLP, hereby answers the third amended complaint, dated April 28, 2023 (Dkt. 147) (the "TAC"), filed by Plaintiff Julius Realty Corporation ("JRC"), and states as follows:

## AS TO PARTIES AND INTERESTED NON-PARTIES[1]

1.    Thompson admits the allegations in paragraph 1 of the TAC.

2.    Thompson admits the allegations in paragraph 2 of the TAC.

3.    Thompson admits the allegations in paragraph 3 of the TAC.

4.    Thompson admits the allegations asserted in paragraph 4 of the TAC.

5.    Thompson admits the allegations in paragraph 5 of the TAC.

6.    Thompson denies that James J. Westphal Jr. ("Jim") is a "non-party"; otherwise Thompson admits the allegations in paragraph 6 of the TAC to the extent that that Jim holds himself out to be the President and Treasurer of JRC and the Chairperson and Treasurer of U.S. Eagle Corporation ("USE").

7.    Thompson denies that Scott K. Westphal ("Scott") is a "non-party"; otherwise Thompson admits the allegations in paragraph 7 of the TAC to the extent that that Scott holds himself out to be a director of JRC and the President and Secretary of USE.

8.    Thompson admits the allegations in paragraph 8 of the TAC.

9.    Thompson admits the allegations in paragraph 9 of the TAC.

10.    Thompson denies that the Dawn E. Westphal Trust ("Thompson Trust") is a "non-party," but otherwise admits the remaining allegations in paragraph 10 of the TAC.

---

[1]    The various headings and subheadings of the TAC are not allegations and, thus, do not require a response.  Thompson reproduces them in this Answer solely for convenience.  To the extent a response is required, Thompson denies any allegations contained in any headings and subheadings of the TAC.

11.     Thompson admits the allegations in paragraph 11 of the TAC.

12.     Thompson admits the allegations in paragraph 12 of the TAC.

13.     Thompson admits the allegations in paragraph 13 of the TAC.

14.     Thomspon is without sufficient information to form a belief as to the truth of the allegations asserted in paragraph 14 of the TAC.

15.     Thompson admits the allegations in paragraph 15 of the TAC.

16.     Thompson admits the allegations in paragraph 16 of the TAC.

### AS TO FACTS COMMON TO ALL COUNTS

17.     Thompson refers to JRC's Employment and Severance Agreement with Thompson, dated as of January 6, 2014 (the "ESA"), attached as Exhibit A to the TAC for a true and accurate recitation of its terms.  The remaining allegations in paragraph 17 are legal conclusions, to which no response is required; to the extent a response is required, Thompson denies same.  The ESA is a valid and binding agreement approved as part of the confirmation of USE and JRC's Chapter 11 bankruptcy plan of reorganization.  Thompson further specifically denies the characterization of the ESA as the "Purported Ultra Vires Agreement", the ESA is not and has never been *ultra vires*.

18.     Thompson admits the allegations in paragraph 18 solely to the extent that she participated in the management of JRC and became president in 2005; otherwise, Thompson denies the remaining allegations in paragraph 18 of the TAC.

19.     Thompson admits the allegations in paragraph 19.

20.     Thompson admits the allegations in paragraph 20 solely to the extent that she participated in the management of JRC and the properties it owned; otherwise, Thompson denies the remaining allegations in paragraph 20 of the TAC.

21.     Thompson denies the allegations in paragraph 21.

22.    Thompson denies the allegations in paragraph 22.

23.    The allegations in paragraph 23 of the TAC are a legal conclusion to which no response is required; to the extent that a response is required, Thompson denies the allegations in paragraph 23 and states that Scott was validly and properly removed from the Board of USE.

24.    The allegations in paragraph 24 state a legal conclusion to which no response is required; otherwise, Thompson denies the allegations in paragraph 24.

25.    Thompson admits that Scott's employment with USE was validly terminated, otherwise, Thompson is without sufficient information to form a belief as to the truth of the allegations asserted in paragraph 25 of the TAC.

26.    Thompson admits that USE and its group of subsidiaries, including JRC, entered into Chapter 11 bankruptcy proceedings; otherwise, Thompson denies the remaining allegations asserted in paragraph 26 of the TAC.

27.    Thompson denies the allegations in paragraph 27.

28.    Thompson denies the allegations in paragraph 28.

29.    Thompson denies the allegations in paragraph 29.

30.    Thompson denies the allegations in paragraph 30.

31.    Thompson denies the allegations in paragraph 31.

**A.    As to Dawn's Purported Ultra Vires Agreement[2]**

32.    Thompson denies the allegations in paragraph 32.  Further Thompson specifically says that despite the fact that paragraph 32 of the TAC alleges that the ESA "was never executed", the fully executed ESA is annexed to the TAC as Exhibit "A" (*see* Dkt. 147-1).

---

[2]    Thompson again separately objects to JRC's reference to, definition of, description of, and allegations concerning the "Purported Ultra Vires Agreement."  The ESA is a valid and binding agreement, approved by the Court as part of the USE bankruptcy proceedings and is not now, nor has it ever been, "*ultra vires*."

33.    Thompson denies the allegations in paragraph 33.

34.    Thompson denies the allegations in paragraph 34.

35.    Thompson denies the allegations in paragraph 35.

36.    Thompson denies the allegations in paragraph 36.

37.    Thompson denies the allegations in paragraph 37.

38.    Thompson denies the allegations in paragraph 38 of the TAC, except that, in accordance with the ESA and past practice, JRC purchased an Aston Martin vehicle for Thompson's use.

39.    Thompson denies the allegations in paragraph 39.

40.    Thompson denies the allegations in paragraph 40.

41.    Thompson refers to the ESA for a true and accurate recitation of its terms, which speak for themselves.  To the extent that any of the allegations in paragraph 41 are inconsistent with the ESA, Thompson denies same.  Otherwise, Thompson denies the remaining allegations in paragraph 41.

42.    Thompson denies the allegations in paragraph 42.

43.    The allegations in paragraph 43 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

44.    Thompson refers to the ESA for a true and accurate recitation of its terms, which speak for themselves.  To the extent that any of the allegations in paragraph 44 are inconsistent with the ESA, Thompson denies same.  Otherwise, Thompson denies the remaining allegations in paragraph 44.

45.    Thompson refers to the ESA for a true and accurate recitation of its terms, which speak for themselves.  To the extent that any of the allegations in paragraph 45 are inconsistent

with the ESA, Thompson denies same.  Otherwise, Thompson denies the remaining allegations in paragraph 45.

46.     Thompson refers to the ESA for a true and accurate recitation of its terms, which speak for themselves.  To the extent that any of the allegations in paragraph 46 are inconsistent with the ESA, Thompson denies same.

47.     Thompson refers to the ESA for a true and accurate recitation of its terms, which speak for themselves.  To the extent that any of the allegations in paragraph 47 are inconsistent with the ESA, Thompson denies same.  Otherwise, Thompson denies the remaining allegations in paragraph 47.

48.     Thompson refers to the ESA for a true and accurate recitation of its terms, which speak for themselves.  To the extent that any of the allegations in paragraph 48 are inconsistent with the ESA, Thompson denies same.  Otherwise, Thompson denies the remaining allegations in paragraph 48.

49.     Thompson refers to the ESA for a true and accurate recitation of its terms, which speak for themselves.  To the extent that any of the allegations in paragraph 49 are inconsistent with the ESA, Thompson denies same.

**B.**     ***As to Thompson's Alleged Corporate Misdeeds, Mismanagement, and Theft of Corporate Assets***

50.     Thompson denies the allegations contained in paragraph 50 of the TAC.  Further, Thompson specifically denies and refutes the characterization of the document annexed to the TAC as Exhibit "B" as a "General Ledger"; in reality, Exhibit "B" is a document prepared by Scott for the purposes of litigation and is replete with errors and omissions.

51.     Thompson denies the allegations in paragraph 51.

52.     Thompson denies the allegations in paragraph 52.

53.     Thompson denies the allegations in paragraph 53.

54.     Thompson denies the allegations in paragraph 54.

55.     Thompson is without knowledge or information sufficient to form a belief of the truth or falsity of the allegations in paragraph 55; to the extent a further response is required, Thompson denies the allegations in paragraph 55 to the extent that they allege any wrongdoing by Thompson.

### C.    *As to Thompson's Alleged Breach of Fiduciary Duties and Self-Dealing*

55.     Thompson denies the allegations in paragraph 55.[3]

56.     Thompson denies the allegations in paragraph 56.

57.     Thompson denies the allegations in paragraph 57.

58.     Thompson denies the allegations in paragraph 58.

59.     Thompson denies the allegations in paragraph 59.

60.     The allegations in paragraph 60 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

61.     The allegations in paragraph 61 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

62.     The allegations in paragraph 62 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

63.     Thompson denies the allegations in paragraph 63.

64.     The allegations in paragraph 64 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

---

[3]    The TAC contains two consecutive paragraphs numbered "55", Thompson maintains this error for the sake of consistency.

65.     The allegations in paragraph 65 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

66.     The allegations in paragraph 66 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

67.     The allegations in paragraph 67 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

68.     Thompson is without knowledge or information sufficient to form a belief of the truth or falsity of the allegations in paragraph 68; to the extent a further response is required, Thompson denies the allegations in paragraph 68 to the extent that they allege any wrongdoing by Thompson.

69.     Thompson denies the allegations in paragraph 69.

70.     Thompson admits the allegations in paragraph 70.

71.     Thompson denies the allegations in paragraph 71.

72.     Thompson is without knowledge or information sufficient to form a belief of the truth or falsity of the allegations in paragraph 72; to the extent a further response is required, Thompson denies the allegations in paragraph 72 to the extent that they allege any wrongdoing by Thompson.

73.     Thompson denies the allegations in paragraph 73.

74.     Thompson refers to the referenced debenture for a true and accurate recitation of its terms, which speak for themselves.  Otherwise, Thompson denies the allegations in paragraph

75.     Thompson refers to the referenced debenture for a true and accurate recitation of its terms, which speak for themselves.  Otherwise, Thompson denies the allegations in paragraph 75.

76.    Thompson denies the allegations in paragraph 76.

77.    Thompson admits the allegations in paragraph 77, and further states that such actions were authorized by the ESA.

78.    The allegations in paragraph 78 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

**D.    *As to USE and JRC Shareholder / Board of Director Meetings on April 6, 2020***

79.    The allegations in paragraph 79 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same and states that she was notified of an annual stockholders meeting by individuals that were not authorized to do so.

80.    Thompson refers to the referenced By-Laws for a true and accurate recitation of their terms, which speak for themselves.

81.    Thompson refers to the referenced By-Laws for a true and accurate recitation of their terms, which speak for themselves.  Otherwise, Thompson denies the remaining allegations in paragraph 81.

82.    The allegations in paragraph 82 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

83.    The allegations in paragraph 83 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

84.    The allegations in paragraph 84 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

85.    The allegations in paragraph 85 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

### E.    As to Thompson's Purported Fabricated Corporate Records

86.    Thompson denies the allegations in paragraph 86.

87.    The allegations in paragraph 87 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.[4]

88.    The allegations in paragraph 88 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

89.    Thompson refers to the referenced document for a true and accurate recitation of its terms, which speak for themselves.

90.    Thompson denies the allegations in paragraph 90.

91.    Thompson refers to the referenced document for a true and accurate recitation of its terms, which speak for themselves.  Otherwise, Thompson denies the remaining allegations in paragraph 91.

92.    Thompson refers to the referenced document for a true and accurate recitation of its terms, which speak for themselves.  Otherwise, Thompson denies the remaining allegations in paragraph 92.

93.    The allegations in paragraph 93 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

94.    The allegations in paragraph 94 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

95.    The allegations in paragraph 95 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

---

[4]    Thompson specifically objects to the use and definition of the term "Sham Written Consent" in paragraph 87.

### F.    As to the Delaware Chancery Court Action

96.    The allegations in paragraph 96 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

97.    Thompson refers to the referenced Delaware Stipulation for a true and accurate recitation of its facts, which speak for themselves.

98.    Thompson admits the allegations of paragraph 98.

### G.    As to the Alleged October 27, 2020 Written Consents

99.    The allegations in paragraph 99 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

100.    The allegations in paragraph 100 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

101.    The allegations in paragraph 101 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

102.    The allegations in paragraph 102 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

**AS TO COUNT ONE**
**(Breach of Fiduciary Duties)**

103.    Thompson repeats and realleges the answers contained in the preceding paragraphs as if fully stated herein.

104.    Thompson denies the allegations in paragraph 104.

105.    Thompson denies the allegations in paragraph 105.

106.    Thompson denies the allegations in paragraph 106.

107.    The allegations in paragraph 107 of the TAC call for a legal conclusion, to which no response is required.

108.    The allegations in paragraph 108 of the TAC call for a legal conclusion, to which no response is required.

109.    Thompson denies the allegations in paragraph 109.

110.    Thompson denies the allegations in paragraph 110.

111.    Thompson denies the allegations in paragraph 111.

112.    Thompson denies the allegations in paragraph 112.

113.    Thompson denies the allegations in paragraph 113.

114.    Thompson denies the allegations in paragraph 114.

115.    Thompson denies the allegations in paragraph 115.

116.    Thompson denies the allegations in paragraph 116.

117.    Thompson denies the allegations in paragraph 117.

## AS TO COUNT TWO
### (Conversion)

118.    Thompson repeats and realleges the answers contained in the preceding paragraphs as if fully stated herein.

119.    Thompson denies the allegations in paragraph 119.

120.    Thompson denies the allegations in paragraph 120.

121.    Thompson denies the allegations in paragraph 121.

122.    Thompson denies the allegations in paragraph 122.

123.    Thompson denies the allegations in paragraph 123.

## AS TO COUNT THREE
### (Breach of the Covenant of Good Faith and Fair Dealing)

124.    Thompson repeats and realleges the answers contained in the preceding paragraphs as if fully stated herein.

125.    The allegations in paragraph 125 of the TAC call for a legal conclusion, to which no response is required.

126.    Thompson denies the allegations in paragraph 126.

127.    The allegations in paragraph 127 of the TAC call for a legal conclusion, to which no response is required.

128.    The allegations in paragraph 128 of the TAC call for a legal conclusion, to which no response is required.

129.    The allegations in paragraph 129 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

130.    The allegations in paragraph 130 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

131.    The allegations in paragraph 131 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

132.    The allegations in paragraph 132 of the TAC call for a legal conclusion, to which no response is required; to the extent that a response is required, Thompson denies same.

133.    Thompson refers to the referenced document for a true and accurate recitation of its terms, which speak for themselves.

134.    Thompson denies the allegations in paragraph 134.

Thompson is not required to respond to paragraphs 135 through 142 of the TAC.  Such allegations and claims were deemed withdrawn by Order dated August 5, 2025 (*see* Dkt. 241).

**WHEREFORE**, Defendant Dawn E. Thompson demands judgment against plaintiff Julius Realty Corporation on all counts of the TAC, dismissing the TAC in its entirety with prejudice,

awarding Thompson her costs, attorneys' fees, expenses, and any other additional and further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The TAC fails, in whole or in part, because JRC lacks standing to assert the claims set forth therein.

### SECOND AFFIRMATIVE DEFENSE

The TAC fails, in whole or in part, because this Court lacks subject matter jurisdiction over the claims asserted by JRC.

### THIRD AFFIRMATIVE DEFENSE

The TAC fails, in whole or in part, because the ESA is a valid and binding agreement between the parties, approved as a condition to JRC and USE exiting bankruptcy.

### FOURTH AFFIRMATIVE DEFENSE

The TAC fails, in whole or in part, because the "damages" alleged by JRC are owed to Thompson pursuant to the ESA.

### FIFTH AFFIRMATIVE DEFENSE

The TAC fails, in whole or in part, because, at all times, Thompson's actions with respect to JRC were done in accordance with the business judgment rule.

### SIXTH AFFIRMATIVE DEFENSE

The TAC fails, in whole or in part, because JRC's Certificate of Incorporation and/or By-Laws prohibit the claims asserted by JRC.

### SEVENTH AFFIRMATIVE DEFENSE

The TAC fails, in whole or in part, because JRC did not have the authority to commence and pursue the claims asserted therein.

**EIGHTH AFFIRMATIVE DEFENSE**

The TAC fails, in whole or in part, because JRC and its representatives, agents, and counsel spoliated key and crucial evidence with respect to Thompson's defenses.

**NINTH AFFIRMATIVE DEFENSE**

The TAC fails, in whole or in part, because JRC has suffered no damages and/or compensable loss.

**TENTH AFFIRMATIVE DEFENSE**

The TAC fails, in whole or in part, because Thompson did not breach any duty owed to JRC or its shareholder, USE.

**ELEVENTH AFFIRMATIVE DEFENSE**

The TAC is barred, in whole or in part, under the doctrines of res judicata, equitable estoppel, and judicial estoppel.

**TWELFTH AFFIRMATIVE DEFENSE**

The TAC is barred, in whole or in part, under the doctrine of unclean hands.

**THIRTEENTH AFFIRMATIVE DEFENSE**

The TAC is barred, in whole or in part, under the doctrine of laches.

**FOURTEENTH AFFIRMATIVE DEFENSE**

The TAC is barred, in whole or in part, by the doctrines of set off and/or recoupment.

**FIFTEENTH AFFIRMATIVE DEFENSE**

The TAC is barred, in whole or in part, because the relief sought would result in JRC's unjust enrichment.

**SIXTEENTH AFFIRMATIVE DEFENSE**

The TAC fails, in whole or in part, because JRC cannot establish that Thompson exercised dominion or control over any goods or funds in a manner inconsistent with JRC's rights.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

The TAC fails, in whole or in part, for lack of a condition precedent.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

The TAC fails, in whole or in part, because Thompson did not act in bad faith or with malicious motive in connection with the ESA.

**NINETEENTH AFFIRMATIVE DEFENSE**

The TAC is barred, in whole or in part, under the economic loss doctrine.

**TWENTIETH AFFIRMATIVE DEFENSE**

The TAC fails, in whole or in part, because, at all times relevant hereto, Thompson did not engage in any wrongful and/or unlawful conduct.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

The TAC fails, in whole or in part, because, at all times relevant hereto, Thompson acted in good faith, without malice, and with sufficient justification.  Thus, there is no breach by Thompson of any fiduciary duty allegedly owed to JRC.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

The TAC is barred, in whole or in part, under the doctrine of election of remedies.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

The TAC fails under the doctrines of waiver, ratification, and promissory estoppel. With regard to promissory estoppel, after Jim resigned from the USE Board, he continued to insist that he be the liaison to all shareholders and handle all corporate tax filings and corporate registrations on behalf of USE. He represented to Thompson that he would do so. Thompson relied on Jim's representation and did so reasonably. Not only had Jim been responsible for these tasks prior to his resignation from the USE Board of Directors, but Jim threatened Thompson if she did not allow him to handle shareholder communications and all accounting duties.  Thompson relied on Jim's

representation to her detriment. As a result of Jim failing to abide by his representations to Thompson that he would act as the sole liaison to all shareholders and handle corporate tax filings and corporate registrations on behalf of USE, he created the conditions of which Jim and Scott complain in the TAC.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The TAC is barred, in whole or in part, by the terms of the ESA.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

The TAC is barred, in whole or in part, because JRC and/or its agents acted in bad faith and engaged in other misconduct.

## AMENDED COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Dawn E. Thompson ("Thompson") and the Dawn Thompson Trust (the "Thompson Trust"), by and through their attorneys, Haynes and Boone, LLP, as and for Thompson's counterclaims as well as Thompson's and the Trust's third-party claims (directly and derivatively), allege as follows:

## NATURE OF THE CLAIMS

1.      For over five years, James J. Westphal, Jr. ("Jim") and Scott K. Westphal ("Scott") (collectively, the "Westphals") have engaged in a legal war of attrition against their sister (Thompson), forcing her to sell her home simply to survive, while they continue to misuse corporate assets to fund their vindictive and baseless lawsuit. Jim and Scott have worked together with their personal counsel Norris McLaughlin, P.A. ("Norris McLaughlin") to deny Thompson millions of dollars owed to her, including: compensation, severance pay, accrued vacation, and bonuses pursuant to the Employment and Severance Agreement entered into by Julius Realty Corporation ("JRC") and Thompson, dated as of January 6, 2014 (the "Employment and Severance Agreement"); reimbursement and/or indemnification of her attorneys' fees pursuant to the ESA,

the By-Laws of U.S. Eagle Corporation ("USE"), and the Order of the Bankruptcy Court of the United States District Court of the State of New Jersey (the "Bankruptcy Court"); and payment of debentures by USE.

2.      Compounding their wrongful conduct, the Westphals have funded this lawsuit from JRC's corporate accounts.  The Westphals do not have a contractual right to or a court-order providing for indemnification of their attorneys' fees, unlike Thompson – and yet their fees have been paid by corporate funds since March 2020, demonstrating the gross inequities of the apportionment of attorneys' fees.  Further, all claims asserted by the Westphals were dismissed, and yet Thompson's claims against the Westphals remain.

3.      USE is a family business, and a predecessor entity was passed down to siblings Jim, Scott, and Thompson (and another sibling, Doug).  Each of the siblings purported to run and/or be an employee of a USE subsidiary, which operated like a small private business.  Jim drove his subsidiaries into the ground, which forced USE into bankruptcy.  The only USE subsidiary that remained financially viable and could emerge from bankruptcy, was JRC, which Thompson ran as president.  In order to obtain financing and emerge from bankruptcy, Dawn put up a risky personal guaranty.  In return, Thompson received an Employment and Severance Agreement, approved by the Bankruptcy Court, which was intended to compensate Thompson for the risk and work she was taking on, as well as to protect Thompson from her brothers, who already had a history of engaging in litigation against each other and their companies to vindicate their personal grievances.

4.      Despite the protections built into the Employment and Severance Agreement, the Westphals and their personal counsel Norris McLaughlin wrongfully ousted Thompson from JRC, in violation of the agreement.  The Westphals, with the assistance of their personal counsel Norris McLaughlin, knowingly filed this lawsuit without any authority to act on JRC's behalf.  The sole

document to support the Westphals' claims is annexed to the TAC and purports to be a "general ledger" (*see* Doc. No. 147-2).    However, and critically, this document (the "Litigation Spreadsheet") concededly was created by Scott for litigation purposes (*see* Doc. No. 76-1) out of his malice and personal animus towards Thompson.  It is uncontroverted that Scott is not a CPA, has no formal training, educational background, or experience in finance or accounting – and therefore the Litigation Spreadsheet is not evidence and is not reliable in any way.  The Litigation Spreadsheet has myriad errors and false statements, including the fact that Thompson's contractually-required salary as President of JRC is listed as a "loan" to Thompson.

5.    After wrongfully ousting Thompson from JRC and constraining her to terminate the Employment and Severance Agreement for "good reason," the Westphals have treated JRC like their personal piggybank.  Over five years, the Westphals have still failed to sell JRC's sole asset, a commercial property located at 6 Litho Road in Lawrenceville, New Jersey (the "Litho Property").  Upon information and belief, the Westphals have paid themselves a salary for doing nothing and taken more than $1 million out of JRC, including, $200,000 paid to themselves for "asset recovery consulting," despite not recovering any "asset."   The Westphals destroyed corporate records, including the detailed receipts maintained by Thompson to document her business expenses as JRC's president—which directly undermine Scott's Litigation Spreadsheet. The Westphals even went so far as to enter Thompson's personal storage unit, take her company car, sell it, and pocket the proceeds.

6.    Norris McLaughlin aided the Westphals by, among other things, accepting and concealing Thompson's USE dividend payments—to which she indisputably was entitled as a shareholder of USE.  The Westphals then had tax forms issued to the IRS indicating that Thompson had received those payments (which she did not), causing Thompson to be fined, issued levies,

penalties, and accrued interest by the IRS and California Franchise Tax Board ("FTB"). The Westphals and their personal counsel Norris McLaughlin also repeatedly issued baseless threats to Wells Fargo, Bank, N.A. ("Wells Fargo") to ensure that Thompson's *personal* bank account was and remains frozen.

## **PARTIES**

7.      Thompson is an individual who resides in California. Thompson is the sole trustee of the Thompson Trust.

8.      The Thompson Trust is a shareholder of USE. The Thompson Trust is the record owner of 2,179 shares of USE common stock, which represents approximately 21.43% of the USE common stock.

9.      USE is a corporation incorporated in the State of Delaware. USE's principal place of business is in New Jersey. USE is a family business. USE previously had several subsidiaries (the "USE Entities"). Jim and Thompson each managed separate USE subsidiaries.

10.      JRC is a corporation incorporated in the State of New Jersey. JRC is currently the only operating subsidiary of USE. Thompson was the President of JRC from 2005 through 2020. Following Thompson's successful rehabilitation, marketing, and sale of other properties that JRC owned, JRC currently owns only the Litho Property.

11.      Upon information and belief, Jim is an individual who resides in Nevada. Jim purports to act as a director of USE/JRC. Jim's trust, JJW Trust, is a shareholder of USE.

12.      Upon information and belief, Scott is an individual who resides in Massachusetts. Scott purports to be a director of USE/JRC. Scott's trust, SKW Trust, is a shareholder of USE.

13.      Upon information and belief, JJW Trust is a shareholder of USE.

14.      Upon information and belief, SKW Trust is a shareholder of USE.

15.    Upon information and belief, Norris McLaughlin is a law firm incorporated in New Jersey.  Norris McLaughlin's principal place of business is in New Jersey.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) since the amount in controversy exceeds $75,000, and there is complete diversity of citizenship between the parties.

17.    This Court has personal jurisdiction over JRC, USE, Jim, Scott, the JJW Trust, the SKW Trust, and Norris McLaughlin.

18.    Venue is proper in this Court pursuant to 8 U.S.C. § 1391(b)(2) since acts or omissions giving rise to the present claim occurred in this district and the Litho Property is in this district.

## FACTUAL BACKGROUND

**I.    The Westphals' Mismanagement Of The USE Entities**

19.    Jim ran a subsidiary of USE.  Unlike Thompson, Scott and Jim were not effective managers, and their USE Entities incurred significant and irreparable financial losses.  Jim did not pay attention to his business obligations and made statements to bankers that worked against business interests. USE retained management consultant BDO, who recommended that Jim be terminated, noting that Jim hired an exotic dancer from a strip club he visited to work at Jim's USE subsidiary despite a lack of relevant experience.  Upon information and belief, Jim also hired a bouncer from the same strip club to work at his USE subsidiary, before driving it into bankruptcy.

20.    In addition to Scott and Jim being poor businessmen, their inability to get along with each other contributed to poor financial performance for those aspects of the USE Entities for which they were responsible. Scott referred to Jim as a "glorified clerk." Jim referred to Scott as

"the worst businessman in history." Jim accused Scott of taking Caribbean cruises with his girlfriend that he claimed as business expenses. Scott alleged to the USE board of directors (the "USE Board") that Jim had committed theft, fraud, and malfeasance, and that Jim used corporate monies to pay for exotic dancers. Jim sued Scott for defamation – and Scott and Jim had both of their attorneys' fees and costs in the defamation litigation paid for by the USE Entities.

21.    Jim's mismanagement of the USE Entities, racking up bills at each of the USE Entities, his use and misuse of corporate monies, and their compensation and severance packages eventually resulted in USE's filing of Chapter 11 bankruptcy on January 6, 2011 (the "Bankruptcy").  Most of the creditors in the Bankruptcy derived from TCS, a USE subsidiary for which Jim had responsibility and oversaw.

22.    JRC was the only USE subsidiary with sufficient assets and cash flow to collateralize a bank financing to allow USE to pay creditors and emerge from Bankruptcy.  As a result, JRC was the only remaining USE subsidiary post-Bankruptcy. All other USE subsidiaries were liquidated.

**II.    Thompson Is The Sole Reason USE And JRC Emerge From Bankruptcy**

23.    The bank financing for JRC to emerge from Bankruptcy required a personal guaranty as a form of collateral. Thompson was the only USE shareholder that was willing to provide the personal guaranty as a form of collateral for the bank financing.  As consideration for Thompson's personal guaranty, Thompson entered into the Employment and Severance Agreement and the Bankruptcy Court ordered that Thompson be indemnified for her attorneys' fees in connection with any disputes concerning such agreement—Thompson would not have entered into the agreement without the promise of indemnification given the litigious history of her brothers.

24.     On November 18, 2013, the USE Entities, through their counsel Lowenstein Sandler, LLP ("Lowenstein Sandler"), filed a Motion for Entry of an Order in Further Aid of Confirmation (the "Confirmation Motion"), which sought an Order authorizing the USE Entities to enter into: (i) a $2.6 million loan and credit facility with First Bank, which required several forms of collateral including the personal guaranty of Thompson; and (ii) a "Guarantor Arrangement" with Thompson which provided for the Employment and Severance Agreement, as well as certain protections in the event her employment by JRC was terminated and/or if certain change of control events occurred post-Bankruptcy (the "Guarantor Agreement"). The Guarantor Agreement was approved by a vote of the USE Board, including Jim.

25.     In support of the Confirmation Motion, the USE Entities submitted resolutions from both the USE Board and the board of directors of JRC (the "JRC Board") (the "Resolutions") that Jim authorized and signed. The Resolutions resolved that Thompson personally guaranty the bank financing and Thompson be JRC's president.  The Resolutions further provided that the JRC Board approved a "Negotiation Agreement," which attached a form of the Employment and Severance Agreement that provided for, among other things: minimum annual compensation, cost of living adjustments, and severance pay if Thompson was terminated.

26.     In a declaration attached to the Confirmation Motion, Steven A. San Filippo, the Chief Restructuring Officer of and Bankruptcy Court approved financial advisor to the USE Entities, stated that obtaining Thompson as guarantor was and that the Guarantor Arrangement represented a reasonable use of business judgment.

27.     On November 26, 2013, the Bankruptcy Court granted the Confirmation Motion and entered an Order in Aid of Confirmation of the Plan (the "Order in Aid of Confirmation"), which provided: (i) the "Guarantor Arrangement [is] supported by reasonably equivalent value and

23

fair consideration"; and (ii) "the terms of . . . Guarantor Arrangement are: fair and reasonable and represent the sound exercise of the [USE Entities] business judgment; and in the best interests of the estates, creditors and all shareholders." The Order in Aid of Confirmation authorized the USE Entities to enter the Guarantor Arrangement and "to take all actions necessary to effectuate the Guarantor Arrangement" – which included the entry of the Employment and Severance Agreement.

28.    Following the entry of the Order in Aid of Confirmation, the Employment and Severance Agreement was sent to the JRC Board for review and approval.  The terms of Thompson's Employment and Severance Agreement were commensurate with other high-level executives and/or officers of the USE Entities, notwithstanding that Thompson was the only executive and/or officer to have taken on a personal guaranty (*i.e.*, an assumption of risk) of a USE-related financial obligation.

29.    On December 20, 2013, a JRC Board meeting was organized by Lowenstein Sandler and attended by Thompson, Jim, and Thompson's ex-husband, Philip Thompson ("Philip") who was a member of the JRC Board.

30.    On January 5, 2014, another JRC Board meeting was organized by Lowenstein Sandler and attended by Thompson, Jim, and Thompson's ex-husband, Philip Thompson ("Philip").  With Thompson abstaining, Jim and Philip authorized Philip to execute the Employment and Severance Agreement (annexed hereto as Exhibit "A"). Lowenstein Sandler e-mailed Jim, Philip, and Thompson the minutes from this board meeting later that same day.

31.    On February 10, 2014, a motion to close the Bankruptcy was filed and served on all the parties in interest in the Bankruptcy, including both Scott (individually through his attorney Douglas J. McGill, and on behalf of the SKW Trust) and Jim (individually and on behalf of the

JJW Trust). Prior to the objection deadline, no answer, objection, or other pleading, formal and informal, was filed or asserted in response to the motion.

32.    The final decree closing the Bankruptcy case was ordered on March 11, 2014. The Bankruptcy Court found that the relief was in the "best interests of…all parties in interest; and…appropriate notice having been provided." The Bankruptcy Court permitted any party the "right to seek to re-open the Chapter 11 cases." A certification of service, dated March 13, 2014, provided that both Scott (individually through his attorney Douglas J. McGill, and on behalf of the SKW Trust) and Jim (individually and on behalf of the JJW Trust) were served a copy of the Court's March 11, 2014 final decree.

33.    Scott was not on the JRC Board or the USE Board during and following the Bankruptcy.  Jim, however, was on both the JRC Board and the USE Board during, and for a period of time after, the Bankruptcy.

## III.    Thompson Causes The Companies To Flourish As JRC President

34.    Following the Bankruptcy, and as of January 2014, Thompson became the president of JRC, and exercised her responsibilities in accordance with the Employment and Severance Agreement.

35.    Following the Bankruptcy, Jim and Philip remained on the boards of and remained directors of USE and JRC.  Philip resigned as a board member and director of USE and JRC in 2017.

36.    Thompson rehabilitated JRC's properties located in California, Nevada, Las Vegas, and New Jersey.  As a result of her efforts, Thompson marketed and sold several of JRC's properties at values far above their valuation at the time of the Bankruptcy, to the benefit of JRC, USE, and USE's shareholders.

37.    As part of her role as the president of JRC's nationwide real estate investment company, Thompson frequently travelled across the country to visit the properties and oversee work, leasing efforts, as well as marketing and sales efforts at JRC's properties.  Thompson engaged in continuing education classes and other executive trainings; she worked with other executives, real estate professionals, construction professionals, and vendors to rehab, lease, market and sell the properties.  On behalf of JRC, Thompson leased an office in California dedicated to these tasks, as well as maintained a home office.  Like many other executives, Thompson organized and attended breakfast, lunch, and dinner business meetings in furtherance of JRC's business interests.  Thompson kept receipts from her business-related expenditures, and stored these receipts at JRC's offices, and later at JRC's storage facility in California.

38.    The only JRC property that Thompson did not sell during her tenure as JRC president was the Litho Property.  Thompson, however, engaged experts and supported substantial environmental remediation at the property.  Thompson was compelled to engage in substantial travel to New Jersey (from her home in California) in order to oversee the environmental remediation and marketing of the Litho Property.

39.    Tax filings were not within Thompson's responsibilities as president of JRC. The Employment and Severance Agreement defines Thompson's duties as "day-to-day management and responsibility" and "hiring and contracting, legal, operations, finance, debt, encumbrances, and all other matters affecting the Company's real estate holdings." Thus, Thompson simply did not have any responsibility for corporate level tax or accounting issues, but instead only day-to-day management and other duties as they related to JRC's real estate holdings.

**IV.    Jim's Responsibilities At USE, And Improper Monetary Demands**

40.    As a director and "Treasurer" of USE, Jim insisted on being responsible to provide

USE tax information to the corporate accountant and to ensure the tax returns were timely filed. Jim had sole responsibility for corporate accounting and tax filings for USE and JRC.  Thus, Jim was responsible for collecting and providing expense reporting to the company accounting, accounting for business expenses, and the preparation and filing of JRC and USE tax returns.

41.     In 2017, Jim resigned from his role as a director and "Treasurer" of USE, and he also resigned from the USE Board and the JRC Board.

42.     Although Jim had resigned, he demanded (and received) access to information, sought to exert authority over USE's affairs, sought to direct Thompson on company matters, and controlled the flow of information between Thompson and the other shareholders by withholding shareholder contact information from Thompson.  Jim also insisted that he retain the responsibility to provide USE tax information to the corporate accountant and to ensure the tax returns were filed on behalf of USE.  Thompson acceded to Jimi's demands.

43.     At Jim's request, Thompson repeatedly and continuously delivered USE and/or JRC financial documentation to Jim. On one occasion, after having dinner with Jim, Thompson loaded several boxes of financial information in Jim's car trunk to provide Jim with the information needed for the tax preparation.  When Thompson later asked what happened to the company's information, Jim claimed to have lost it.

44.     Thompson reported ongoing progress of the environmental remediation at the Litho Property to Jim, who praised Thompson's efforts as late as August 2019.  By e-mail dated April 20, 2017, Jim acknowledged Thompson's authority under the Employment and Severance Agreement by claiming Thompson is "given the power and authority to sell any and all properties owned by Julius" and the Employment and Severance Agreement "give[s] you authority to take action of ALL properties owned by 'the Company.'"  In an e-mil dated November 17, 2019, Jim

acknowledged that Dawn's Employment and Severance Agreement gave her the "authority to do as you [Thompson] deem necessary."

45.     Things took a turn for the worse, however, when Jim started to demand monetary payments from Thompson and USE. Starting in late 2019, Jim improperly demanded that monies be paid to him personally at the exclusion of other shareholders.   Jim initially demanded $40,000.00 as a "salary" for assisting with tax preparation and serving as the self-proclaimed shareholder liaison. Jim became irate when Thompson said his demanded "salary" was not warranted.   Jim then improperly demanded a $100,000.00 personal loan from USE, saying he "really need[ed] the money" and "need[ed] to pay [his] bills, especially Federal taxes."   When Thompson tried to perform the proper due diligence for the benefit of USE shareholders and asked Jim for evidence that he could repay such a personal loan, Jim grew irate, threatened Thompson, and cut off communications with her.

## V.     The Westphals And Norris McLaughlin Wrongfully And Improperly Commence This Action Without Authorization, As Well As Wrongfully And Improperly Seize Control of USE And JRC Without Any Authority To Do So

46.     The Westphals orchestrated a scheme to coerce Thompson to renounce her employment and severance rights and authorize unwarranted payments to the Westphals by engaging in improper litigation conduct, including, critically, engaging Norris McLaughlin to file the underlying complaint in this action on behalf of JRC and USE at a time when the Westphals were not officers, directors or board members of those entities and did not have the authority to act on their behalf.

47.     On March 27, 2020, the Westphals notified Thompson that an annual stockholders' meeting of USE "would occur on April 6, 2020."

48.    However, on April 3, 2020 – ***three days <u>before</u> the April 6 annual stockholder meeting*** – Norris McLaughlin, purporting to act as counsel for JRC and as counsel for the Westphals, improperly commenced this action against Thompson – despite the fact that Offit Kurman, P.A. ("Offit Kurmna") was JRC's counsel at that time.[5]

49.    On April 6, 2020—three days after Norris McLaughlin filed this lawsuit—USE allegedly held a board meeting (the "Sham Meeting") following a purported March 27, 2020 "Notice of Meeting of the Stockholders" (the "Sham Meeting Notice"). The Sham Meting Notice stated that such "meeting" was to be considered the "annual meeting," the purpose of which is to elect directors. This was directly contrary to the USE By-Laws, which provide that the annual meeting is to be held at such hour and such day in April or May as determined by the president or by the USE Board.

50.    The Sham Meeting Notice was signed by SKW Trust as Stockholder, JJW Trust as Stockholder, and Scott as Director.  However, under USE's By-Laws, the annual meeting of stockholders for the election of directors can only "be called by the President or Board of Directors."  From August 16, 2010 through April 6, 2020:

- Thompson was the sole board member of JRC and a member of the USE Board;

- The Westphals were not board members of JRC or USE;

- The Westphals were not officers or directors of JRC or USE; and

- Offit Kurman – not Norris McLaughlin – was JRC's corporate counsel until it was allegedly terminated by the Westphals on April 6, 2020.

---

[5]    This action was originally filed in the Superior Court of New Jersey, Law Division, Mercer County, Docket No. MER-L-697-20, captioned *Julius Realty Corp. v. Thompson*.  Thompson removed the action to this Court pursuant to 28 U.S.C. § 1441 on April 20, 2020.

51.     At the April 6, 2020 meeting (three days *after* this action was commenced by JRC and the Westphals), the Westphals through proxies and entities they owned or controlled, "voted to remove the then-current directors of USE and to elect Scott and Jim to be the directors of U.S. Eagle."

52.     Following the April 6 Meeting, USE, as sole shareholder of JRC and acting through its newly appointed officers (the Westphals), acted by written consent to remove all then-current directors of JRC and to appoint Scott and Jim as directors of JRC.

53.     Thereafter, on May 26, 2020, JRC and the Westphals filed an amended complaint against Thompson (the "FAC"), adding USE and two trusts owned by Jim and Scott (JKW and SKW) as plaintiffs.  Thompson filed her Answer to the Amended Complaint with Counterclaims on June 30, 2020.

54.     On August 25, 2020, Scott and Jim filed an action in Delaware Chancery Court to determine the composition of the USE Board.

55.     On October 16, 2020, the Delaware Chancery Court signed a Stipulation and Order of Voluntary Dismissal, whereby Scott, Jim, and Thompson stipulated that as of August 21, 2020, the USE Board was compromised of Scott, Jim, and Thompson.  Thus, pursuant to the parties' stipulation, Thompson was the sole member of the USE Board when this action was commenced on April 3, 2020, and when FAC was filed.

56.     Thereafter, Jim and Scott improperly acted by written consent to remove Thompson: (i) from the USE Board and to confirm Scott and Jim's positions on the board; and (ii) from all positions with USE and JRC.

57.     JRC did not have the authority to commence, and continue to litigate, this action. On November 18, 2024, Norris McLaughlin finally produced an unsigned letter dated March 18,

2020, between Norris McLaughlin and USE, JRC, and the Westphals, Bates stamped Plaintiff's Docs10838-41 (the "Unsigned Retainer Letter"). Thompson's counsel immediately requested that Norris McLaughlin produce a "complete, fully executed version" and information concerning when, if ever, the agreement was countersigned. Norris McLaughlin responded that they were "not sure if it was ever signed."

58.     On December 23, 2024, Norris McLaughlin provided an additional document, Bates stamped Plaintiff's Docs 18042-45, which was a different version of the Norris McLaughlin retainer letter purportedly countersigned by the Westphals *in their individual capacities only* and not countersigned by JRC or USE (the "Signed Retainer Letter").

59.     The Signed Retainer Letter is dubious. Indeed, the subject line of the Signed Retainer Letter states "*Re: Corporate Matters*", which is different than the subject line of the Unsigned Retainer Letter, which states "*Re: Dawn Westphal*.

60.     Further, although the Unsigned Retainer Letter is dated "March 18, 2020", the "document properties" of the PDF indicate that the Unsigned Retainer Letter was created on or about November 18, 2024 (the date it was produced):

| | |
|---|---|
| Created: | 11/18/2024 12:01:11 PM |
| Modified: | 11/18/2024 12:01:11 PM |
| Application: | Westphal Engagement Letter.pdf |

61.     Similarly, although the Signed Retainer Letter is also dated "March 18, 2020," the "document properties" of the PDF indicate that the document was created on March 19, 2020 (one day later), and was modified several months later on November 22, 2024:

| | |
|---|---|
| Created: | 3/19/2020 4:15:28 PM |
| Modified: | 11/22/2024 12:02:10 PM |
| Application: | Adobe Acrobat Pro DC 20.6.20042 |

62.     The fact that JRC originally produced only the Unsigned Retainer Letter without indicating that different versions and/or signed versions exist speaks volumes.

63.     Accordingly, Norris McLaughlin had to have known that it did not have authority to file the complaint in this action on behalf of JRC.  Nonetheless, Norris McLaughlin filed the complaint and represented to the Court that it was acting on behalf of JRC.

## VI.  Thompson Is Constrained To Terminate Her Employment And Severance Agreement For "Good Reason"

64.     JRC's contention that Thompson was terminated for "Cause" is flatly contradicted by the documentary evidence.  Article IV of the Employment and Severance Agreement delineates the manners in and reasons for which Thompson may be terminated (*see* Ex. A). Under Section 4.01(B), JRC, as Employer, may terminate Thompson "for Cause (as defined herein) by providing [Thompson] thirty (30) days prior written notice of termination in reasonable detail with the basis on which the Employer believes it may terminate [Thompson] for Cause, with an opportunity to cure during such thirty (30) day period to the extent curable."

65.     The Employment and Severance Agreement further provides that "[f]or purposes hereof, 'Cause' shall mean [Thompson]'s (i) conviction of, guilty plea or confession of guilt of a felony or another crime involving moral turpitude, (iii) willful misconduct or gross negligence which reasonably could be expected to be injurious to the business, operations or reputation of Employer (monetarily or otherwise), (iv) subject to Exhibit A of this Agreement, violation of Employer's material policies or procedures in effect from time to time, (v) material and continuing failure to satisfactorily perform [Thompson]'s material duties as set forth in Exhibit A, or (vi) other material breach of this Agreement (including, without limitation, any breach of [Thompson]'s obligations under Article V hereof)."

66.    However, and critically, JRC never provided Thompson with "(30) days prior written notice of termination in reasonable detail with the basis on which the Employer believes it may terminate [Thompson] for Cause, with an opportunity to cure during such thirty (30) day period to the extent curable," in accordance with Section 4.01(B) of the Employment and Severance Agreement.

67.    Further, Section 4.01(C) of the Employment and Severance Agreement provides that JRC may, "at its option, at any time terminate [Thompson]'s employment for no reason if such termination is deemed through arbitration in accordance with Section 4.02(D) of this Agreement not to damage the value of Employer or Company." Further, any termination without cause "shall be subject to [Thompson]'s rights under the severance provision below."

68.    However, and critically, JRC never commenced arbitration, in accordance with Section 4.01(C) of the Employment and Severance Agreement.

69.    JRC did not follow any of the procedures necessary to properly terminate Thompson either for "Cause" or without cause.  Thus, the Westphals'/JRC's termination of Thompson is in breach of the Employment and Severance Agreement, so Thompson is entitled to all compensation and funds under the Employment and Severance Agreement.

70.    Under Section 4.02(B), "in the event of a termination by Employer without Cause…in addition to the Accrued Obligations, Employer's obligation under this Agreement or otherwise shall be to pay to [Thompson] . . . 'Severance Pay' in the amount of [Thompson]'s then-current Base Salary . . . and . . . an amount equal to the Additional Severance Pay." "Additional Severance Pay" is defined in Section 4.02(C) as One Million, Three Hundred Thousand Dollars ($1,300,000.00).

71.    Thompson has the clear and express right to terminate her own employment "for

Good Reason" under the Employment and Severance Agreement "by providing JRC with thirty (30) days prior written notice for termination and an opportunity to cure to the extent curable during such thirty (30) day period." "Good Reason" is defined to mean a failure by JRC to make any payments due under the Employment and Severance Agreement, a material change or interference in Thompson's title, duties or responsibilities, a change in control, or other material breach of the agreement.

72.    Accordingly, Thompson sent an October 5, 2020 letter terminating the Employment and Severance Agreement for "Good Reason" with a thirty-day cure period, which was to be effective on November 4, 2020. (A copy of the October 5, 2020 termination letter is annexed hereto as Exhibit "B".)

73.    Instead of curing the wrongful acts outlined in the October 5, 2020 letter to JRC, on October 28, 2020, the Westphals'/JRC's counsel sent Thompson's counsel certain "Written Consents" purportedly terminating Thompson's employment with JRC.  However, and critically, these "Written Consents" violated the contractual obligations of the Employment and Severance Agreement since they did not provide "in reasonable detail" the basis for the termination, nor did they use any of the specific language detailed in and required by Section 4.01(B) of the Employment and Severance Agreement. They also do not provide a thirty (30) day cure period.

74.    By letter dated November 3, 2020 to the Westphals'/JRC's counsel, Thompson responded to the "Written Consents."   Thompson's November 3, 2020 letter ratified that Thompson terminated her employment for "Good Reason." (A copy of Thompson's November 3, 2020 letter to the Westphals'/JRC's counsel is annexed hereto as Exhibit "C".)

75.    Accordingly, the documentary evidence establishes that Thompson did not resign in April 2020, as the Westphals/JRC repeatedly have contended without basis.  Rather, the

evidence demonstrates that Thompson clearly terminated her employment for "Good Reason" once the cure period expired under Paragraph 4.01(E) of the Employment and Severance Agreement after Thompson sent her letter dated October 5, 2020 and her counsel sent the November 3, 2020 letter (*see* Exs. B and C).

76.     For their part, JRC and the Westphals have proffered different and contradictory theories of Thompson's termination.  For example, by letter dated April 29, 2024, to the Court, JRC states on page 1 that "Thompson effectively resigned from her position with JRC on April 6, 2020" (emphasis added).  In a different filing, JRC stated that it was not until October 27, 2020, that the Westphals acted, *purportedly by written consent*, to "terminate[] Ms. Thompson as President of Julius Realty."

77.     Thompson is entitled under the Employment and Severance Agreement to over $1.9 million in employment and severance pay, accrued vacation, and bonuses.

78.     Additionally, pursuant to Section 3.02 of the Employment and Severance Agreement, Thompson is "entitled to receive reimbursement from Employer for all reasonable out-of-pocket expense incurred by [Thompson] during the Term in connection with the performance of [Thompson]'s duties and obligations under this Agreement, according to Employer's annual budget, expense account and/or reimbursement policies in place from time to time and provided that [Thompson] shall submit reasonable documentation with respect to each such expenses."

79.     Thompson has expended personal funds in furtherance of and in connection with her performance of her duties and obligations under the Agreement.  Thompson is therefore entitled to receive reimbursement of these expenses.

**VII.    Dividend Payments Due To Thompson Wrongfully Were Concealed And Withheld**

80.    From 2020 through 2023, the Westphals (through USE) and with the assistance of Norris McLauglin engaged in a pattern of self-dealing where they declared and paid themselves several hundred thousand dollars of dividends to all of the shareholders of USE *other than the Thompson Trust*.  The Westphals (through USE), and upon information and belief with the assistance of Norris McLaughlin, unilaterally chose: (i) not to pay one shareholder – the Thompson Trust – its pro rata share of hundreds of thousands of dollars of USE dividends or make distributions from 2020 through July 2023; (ii) not to even notify Thompson or the Thompson Trust that USE was paying at least seven dividends or distributions to all of the other shareholders of USE; and (iii) to pay less than Thompson Trust's *pro rata* share of its USE dividends into Norris McLaughlin's escrow account. In lieu of paying the dividends to the Thompson Trust, the Westphals and their personal counsel illicitly deposited the dividends into Norris McLaughlin's escrow account, a fact their counsel conceded on July 27, 2022.

81.    The quarterly dividend payments to which the Thompson Trust was entitled were in the amount of approximately $27,237.50 each.  Accordingly, the Westphals and their personal counsel Norris McLaughlin withheld in excess of $270,000 in dividend payments from Thompson.

82.    The Westphals unilaterally and surreptitiously were depositing Thompson's approximately $27,237.50 quarterly dividend payments into Norris McLaughlin's escrow account. The Westphals and Norris McLaughlin failed and/or refused to even notify Thompson or the Thompson Trust of the payment of these quarterly dividends or distributions to all of the other shareholders of USE.

83.    The USE By-laws and Delaware law require declared dividends to be paid *pro rata* to all shareholders.  Section 7.7 of the USE By-laws provides in relevant part, that subject to the

provisions of USE's Certificate of Incorporation and the law, the USE Board "may declare and pay dividends or make other distributions on the outstanding shares in such amounts and at such time or times as, in its discretion, the condition of the affairs of [USE] shall render advisable."

84.     Under Delaware law, a distribution/dividend must always be pro rata, equal, and without discrimination or preference.  Further, as provided in 11 Fletcher Cyc. Corp. § 5352, "dividends among shareholders of the same class generally must be distributed on a pro rata basis without discrimination or preference.  In other words, the board of directors cannot pay dividends only to certain shareholders to the exclusion of others of the same class or give certain shareholders more than others of the same class."  There can be no preference or discrimination among the stockholders in the payment of dividends.  The Westphals, who wrongfully took control of the USE Board – cannot pay dividends only to certain shareholders (*i.e.*, themselves, through their trusts) to the exclusion of others of the same class (*i.e.*, the Thompson Trust).

85.     No provision of the USE By-laws or Certificate of Incorporation permits USE or the Westphals to withhold paying distributions or dividends to a shareholder, or to offset any declared distribution or dividend against USE's or the Westphals' arguably frivolous claims against Thompson.

86.     All other shareholders other than the Thompson Trust not only were notified of USE's dividends or distributions from 2020 to the present day, but have been paid and received all dividends or distributions made by USE (by and through the Westphals) from 2020 to the present day, including the Westphals through their respective trusts.  The Thompson Trust is the only shareholder that was never notified of, much less been paid and received, such dividends or distributions – demonstrating that the Westphals have been acting in bad faith and discriminating against Thompson and the Thompson Trust.

87.     Compounding their wrongful conduct, upon information and belief, USE (by and through the Westphals) issued Form 1099-DIV to the U.S. Internal Revenue Service ("IRS") for the years 2020, 2021, 2022, and 2023, certifying that several hundred thousand dollars of dividends were paid to and received by the Thompson Trust – despite the fact that none of these funds had been received or paid to Thompson or the Thompson Trust.

88.     Form 1099-DIV is submitted to the IRS along with Form 1096, which requires the submitter to declare that "[u]nder penalties of perjury, I declare that I have examined this return and accompanying documents and, to the best of my knowledge and belief, they are true, correct, and complete."

89.     Further compounding their wrongful conduct, Thompson was not provided and did not know these 1099s had been issued until years later (in fact, Thompson was first provided with several of these 1099s in early 2025).

90.      It was not until July 14, 2023 that Thompson finally received these back dividends/distributions from 2020 through Q1 2023.  Further compounding their duplicitous and wrongful conduct, USE (by and through the Westphals) did not provide – much less timely provide – the aforementioned 1099s to Thompson.  Accordingly, the Westphals' wrongful and illicit conduct caused Thompson to be fined, issued levies, penalties, and accrued interest by the IRS and FTB because USE (by and through the Westphals) issued Form 1099-DIV documents to the IRS for the 2020, 2021, 2022, and 2023 years certifying that several hundred thousand dollars of dividends were paid to and received by the Thompson Trust – despite the fact that none of these funds had been received or paid to Thompson or her Trust until July 14, 2023.

## VIII.    The Westphals' Self-Dealing

91.    JRC has maintained a bank account at FirstBank Holding Co. ("FirstBank").   In July 2020, the FirstBank account contained approximately $1.4 million.   On July 9, 2020, Thompson illicitly was removed as an authorized signatory on FirstBank account, and that Scott and an attorney from Norris McLaughlin were the only signatories on that account.

92.    Upon information and belief, false and/or sham corporate resolutions were submitted to FirstBank which falsely indicated that Scott and Jim had the authority to act on behalf of JRC and USE.

93.    Upon information and belief, while in control of the FirstBank account, the Westphals looted that bank account.  As of September 20204, the FirstBank account currently held approximately $172,007.  Thus, the losses from the Westphals' improper use and misappropriation of the FirstBank account are excess of $1 million.

94.    As set forth more fully below, the Westphals surreptitiously misappropriated Thompson's company car, sold it and pocketed the sale proceeds amounting to $81,000.   In addition, the Westphals misappropriated $200,000 from JRC's accounts.  Specifically, Jim and Scott each misappropriated $100,000 from JRC, which they claim is for "Asset Recovery Consulting Services" for the period 2020 through 2023.  The Westphals did not conduct any valid or proper asset recovery services for JRC, whose sole current business is managing and selling the Litho Property.

## IX.    The Improper Destruction, Misappropriation, And/Or Spoliation Of Thompon's Business Records And Other Corporate Records

95.    All of Thompson's, JRC's and USE's corporate records have been under the possession, custody, or control of the Westphals, JRC, and Norris McLaughlin since 2020.

96.    The Westphals and/or their personal counsel Norris McLaughlin cannot, on one

hand, destroy/conceal/fail to preserve evidence of Thompson's business receipts and expenses, while, on the other hand, assert that "the support for seemingly all of the remaining amounts for which JRC is being directed to reimburse Thompson comes solely from Thompson herself."

97.    The Court already has made a finding that the Westphals "***fail[ed] to maintain original records during the course of litigation***," which was a basis for the Court appointing the SFA in the first place.  *See Julius Realty Corp. v. Thompson*, 20-CV-04575, 2022 WL 2981003, at *7 (D.N.J. July 28, 2022) (emphasis added).

98.    Compounding their wrongful conduct, there is clear documentary evidence supporting the fact that the Westphals and/or their counsel did destroy/conceal/fail to preserve Thompson's receipts that support all of her business expenses, including the handful of expenses that remain at issue.

99.    As background, the Westphals wrongfully wrested control of both JRC and USE in April 2020.  Since that time, Thompson has been locked out of her JRC e-mail account, has had no access to any USE or JRC financial accounts, and has had no access to JRC's storage units where hard copy corporate records (including receipts) have been stored.

100.    Thompson and her counsel repeatedly placed the Westphals/JRC and their counsel on notice of their duty to preserve and secure all JRC and USE records, such as the storage lockers containing company records (including Thompson's receipts for her business expenses and expenditures).  By e-mail dated December 8, 2020, Thompson's former counsel stated to the Westphals'/JRC's counsel:

> Further to our discussions, Julius Realty maintains an 18' x 11' storage unit that has approximately 40 bankers boxes and other materials located at Pacific Mesa Properties, 670 17th Street, Unit 10, Costa Mesa CA 92627.

> Ms. Thompson is moving 12 two-drawer filing cabinets and additional furniture into the storage unit, and those items should be there by this Thursday.

Finally, there is a locker with wine located at 1605 Orange Ave., Costa Mesa CA 92627, locker #181.  If you have trouble finding it, you can contact Liz at 949-650-8463.

101.    A July 30, 2021 follow-up e-mail from Thompson's former counsel to the Westphals'/JRC's counsel reads in pertinent part:

> We understand that Julius Realty Corporation maintains a storage unit (#010) at Pacific Mesa Properties / 17th Street Self-Storage located at 670 W. 17th Street, Costa Mesa, California and that hard copies of certain Julius company records (in addition to other Julius property) are being stored in the unit.  We further understand that one of Julius' representatives (possibly Scott Westphal) has been in contact with the storage facility's property manager, Bruce Bear, and that Julius is continuing to make payments for the unit.
>
> However, Mr. Bear recently has been requesting that our client provide him with a written "Notice-to-Vacate" the unit.  Our client has instructed Mr. Bear that she has no authority to speak on Julius' behalf and that she cannot authorize any actions with respect to the unit.
>
> We wanted to bring this to your attention so that Julius can take all appropriate steps to prevent the storage facility from taking possession of, and/or destroying, the corporate records so that they are preserved for this litigation.
>
> Mr. Bear's contact information is below.

102.    Thompson's counsel followed-up again in another e-mail to the Wesstphals'/JRC's counsel and on August 2, 2021 which stated, "I am following up on [our] e-mail to you below.  At your earliest convenience today, kindly confirm that JRC has taken action to preserve the corporate records in the below-referenced storage unit."

103.    Because she was no longer a JRC employee, Thompson also had instructed the property manager of JRC's Costa Mesa storage unit, Bruce Bear ("Bear"), that "she has no authority to speak on Julius' behalf and that she cannot authorize any actions with respect to the unit," but that the property manager should contact "current management (Jim and/or Scott Westphal) about the unit . . . their future plans for the unit and whether they would like to vacate

the unit or not." Thompson's counsel then relayed this message to Norris McLaughlin by e-mail, which was accepted by Norris McLaughlin without any response thereto.

104.    Norris McLaughlin also did not refute the fact that the Westphals had been in contact with Bear (the property manager at the Costa Mesa storage facility) when Thompson's counsel notified counsel for the Westphals/JRC that the materials in the Costa Mesa storage unit should be preserved by Norris McLaughlin and their clients for litigation.

105.    Critically, at the time of Thompson's separation from JRC, the Costa Mesa storage unit contained a number of corporate records, including voluminous receipts from Thompson documenting her business expenses (the "Expense Records"). Photographic evidence of a sampling of such records in binders located in the Costa Mesa storage unit follows:



106.    According to the company's special fiscal agent (the "SFA"), those Expense Records were not found in the storage unit during his inspection of the unit in August 2023. Neither the Westphals nor Norris McLaughlin has produced those Expense Records in discovery

in this matter.

107.    In addition to the fact that only the Westphals and/or Norris McLaughlin had sole access to the storage unit during the relevant time, Bear indicated that a JRC representative, likely Scott, had been in touch with him regarding the unit in 2021.  The Westphals also indicated to the SFA in an email dated on or about June 20, 2023, that they knew there were blueprints in the storage unit (and they would not know the contents of the unit unless they or a representative had been in the unit).  Further, Norris McLauhglin indicated to the SFA that he had the key to the unit.

108.    The behavior described herein is consistent with the Westphals' prior conduct.  For example, in 2000, Scott accused Jim of destroying expense account records, writing in a letter to the Chair of USE's audit committee, that he saw Jim "on an uncharacteristic Sunday appearance to the Corporate offices carrying papers from the safe. The following Monday, his expense accounts were missing."

109.    Similarly, JRC and USE corporate records also were stored at a storage facility in New Jersey.  During a telephonic meet and confer on July 8, 2021, David Roberts (counsel for the Westphals/JRC) conceded that the Westphals had destroyed those corporate records during the pendency of this litigation.   These include corporate records from that storage facility that Thompson transferred to the Westphals after she departed the company.

## X.    The Westphals Misappropriate Thompson's Car, Sell It, And Pocket The Proceeds

110.    Section 3.01(B) of the Employment and Severance Agreement provides that "Employer agrees to transfer to [Thompson] title of the automobile [Thompson] currently uses in conducting business on behalf of Employer. Employer further agrees to obtain for [Thompson]'s use during the Term (through a lease or purchase) a new automobile comparable to the make and model of the automobile being transferred."

111.     Thompson was never transferred title to a vehicle in accordance with Section 3.01(B).

112.     An Aston Martin ("Thompson's Car") was purchased for Thompson in accordance with Section 3.01(B).   Thompson has a clear contractual right to remain in possession of Thompson's Car.

113.     It has been the custom of USE/JRC to provide executives with new luxury vehicles every two years. Jim and Scott have also been provided with new luxury vehicles per this custom. Scott often drove high-end BMWs and Jim also drove well-equipped luxury vehicles.   For example, in 2007, Jim received a $77,000 Mercedes with an AMG sport package as a company vehicle.   The Westphals concede in JRC's Third Amended Complaint that "the family-operated business had always awarded an executive's company-owned vehicle upon termination as a conciliatory demonstration of good-faith."

114.     Despite her entitlement to retain Thompson's Car, Thompson's counsel and Norris entered into discussions regarding an agreement that would turn over Thompson's Car to JRC— subject to several specific conditions—during the pendency of this matter with the proceeds of sale to be held in escrow pending a resolution of this matter.

115.     The Westphals, however, circumvented any agreement and disregarded all of the conditions thereto.   The Westphals illicitly entered a storage unit owned by Thompson without her permission, misappropriated Thompson's Car without Thompson's knowledge and authorization, illicitly sold Thompson's Car, and illicitly pocketed the proceeds.

116.     Norris McLaughlin has disclaimed knowledge of the Westphals' illicit and wrongful acts, where Mr. Roberts claimed in an April 29, 2022 e-mail that he "spoke to the client [the Westphals] to get an update on the car after I got your email.  I will concede that our clients

did not adhere to what we told them to do.  They got the car without giving you notice.  And they sold it without sending us the money."

117.    Not only did the Westphals misappropriate and sell Thompson's Car without authorization, upon information and belief, the Westphals retained the proceeds of that sale and even paid themselves a fee in connection with their conduct.

118.    The Westphals' sale of Thompson's Car also further demonstrates the Westphals' spoliation of evidence.  The title to Thompson's Car was located in JRC's Costa Mesa storage unit. Accordingly, upon information and belief, the Westphals (and/or their agents or representatives) accessed the Costa Mesa storage unit to retrieve the title to sell Thompson's Car in or about the spring of 2022.  Accordingly, the Westphals must have entered and reviewed the documents in the Costa Mesa storage unit—including Thompson's business expense receipts and notes—in 2022. A year later, in or around August 2023, the SFA finally accessed the Costa Mesa storage unit and discovered that Thompson's business expense receipts and notes had been removed and/or destroyed.

## XI.    The Westphals And Their Personal Counsel Improperly Obtain An Extrajudicial Freeze of Thompson Personal Bank Account

119.    At all relevant times, Thompson has been in a banking relationship with Wells Fargo where she maintains a personal bank account comprised of her personal funds (the "WF Account").

120.    In correspondence from April 2020 through May 2021, the Westphals and Norris McLaughlin, purporting to act on behalf of JRC, made false and unsubstantiated assertions to Wells Fargo that funds in the WF Account belong to JRC and threatened to commence legal process against Wells Fargo.  As a direct consequence of these baseless threats, Wells Fargo placed a freeze on Thompson's personal funds in the WF Account to protect itself from being sued.

121.     In May and June 2023, JRC was directed to "dissolve the 'freeze' placed on the personal account(s) of Dawn Thompson."  JRC and Norris McLaughlin wrongfully failed and/or refused to do so, and to date they wrongfully have refused to withdraw their demand and threat of legal action against Wells Fargo.

122.     Wells Fargo has acknowledged that the sole basis for its freeze of Thompson's WF Account is the baseless threats from the Westphals and Norris McLaughlin.

123.     Thompson's account remains frozen and she cannot access any of her personal funds in the WF Account as a result of the Westphals' and Norris McLaughlin's interference with her relationship with Wells Fargo.

124.     The Westphals and Norris McLaughlin knew at the time they issued their baseless threats that Thompson was in a banking relationship with Wells Fargo, and that this relationship continues to the present date.  Further, the Westphals and Norris McLaughlin know that Wells Fargo will continue to improperly freeze the WF Account unless they withdraw their baseless threats and claims of wrongdoing against Wells Fargo.

## XII.    USE's Wrongful Failure To Pay Thompson's Debentures

125.     USE also owes Thompson hundreds of thousands of dollars plus interest pursuant to two debentures. On November 1, 1989, USE executed two 12% Subordinated Debentures (the "Debentures"), one to Thompson and one to her mother, Margaret Helen Westphal.  Scott signed both Debentures.

126.     Each Debenture promises to pay the holder "the principal sum of THREE HUNDRED THOUSAND DOLLARS ($300,000.00), together with interest."

127.     Each Debenture also states that the "rate at which interest shall accrue and be paid on each Payment Date shall be twelve percent (12%) per annum."

128.    After Thompson's mother died, Thompson became the trustee of her estate; and as trustee, Thompson is entitled to one-fourth of this Debenture after payment of expenses. USE, however, paid only part of these Debentures. Thompson has been and is entitled the principal and interest due and owing on the Debentures, which exceed $400,000.

### XIII.    Thompson Is Entitled To Be Reimbursed And/Or Indemnified For All Of Her Attorneys' Fees And Costs Incurred Concerning This Dispute And Her Employment And Severance Agreement

129.    The Westphals, acting individually, on behalf of their trusts, and improperly acting by and through USE and JRC, wrongfully and inequitably have been using company funds to pay for their personal vendetta of a lawsuit against Thompson.  The Westphals have no contractual or court-ordered right to have their legal fees paid by USE and/or JRC.

130.    Thompson is owned in excess of $2 million in unreimbursed attorneys' fees pursuant to: (i) the Employment and Severance Agreement; (ii) the By-laws of both JRC and USE; and (iii) court orders from the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  Section 3.04 of the Employment and Severance Agreement clearly and unequivocally provides that "[t]he Company shall also indemnify, defend, save and hold Employee harmless from any liabilities, costs, claims, suits or other charges, including (but not limited to) reasonable legal fees that Employee incurs or incurred if Employee is sued or threatened with suit to the greatest extent permitted by law."

131.    Importantly, the Westphals/JRC have no pending claim—since they were all dismissed—to invalidate or otherwise disturb the Employment and Severance Agreement, so it must govern.  JRC's By-laws also provide that JRC "shall indemnify any corporate agent (as defined in subsection 14A: 3-5(l)(a) of the Business Corporation Act) to the fullest extent."  The Bankruptcy Court also entered an Order providing that "[n]one of the officers, directors,

shareholders, representatives or agents of the Reorganized Debtors [which include USE and JRC] or their officers, directors or shareholders shall have any liability relating to, or arising from…the Guarantor Arrangement," which includes the Employment and Severance Agreement.

132.    Accordingly, JRC's obligation to pay these fees cannot be in dispute, yet it is wrongfully refusing to do so in a cynical effort to drain Thompson's resources.

133.    As a matter of equity, the Westphals cannot have their attorneys' fees paid with corporate funds, while refusing to have Thompon's fees paid with corporate funds.

### AS AND FOR A FIRST CAUSE OF ACTION

### (Counterclaim by Thompson for Breach of Contract Against JRC)

134.    Thompson repeats and realleges all of the foregoing allegations as though fully set forth herein at length.

135.    Thompson and JRC are parties to the Employment and Severance Agreement.

136.    The Employment and Severance Agreement is valid and enforceable.

137.    Thompson is not in breach of the Employment and Severance Agreement, and has performed her obligations under this agreement for the benefit of JRC.

138.    As is set forth more fully above, JRC breached the Employment and Severance Agreement, including the covenant of good faith and fair dealing implicit in such agreement by, among other things: failing and/or refusing to pay Thompson her severance pay, accrued vacation and benefits pay, and "Additional Severance" pay; failing and/or refusing to indemnify, defend, save and hold Thompson harmless from any liabilities, costs, claims, suits or other charges, including (but not limited to) reasonable legal fees that Thompson incurs or incurred; failing and/or refusing to transfer to Thompson title of the automobile Thompson currently used when she

entered into the agreement, as well as to obtain a new automobile for Thompson's use; attempting to terminate and/or terminating Thompson in breach of Article IV of the agreement.

139.    Despite due demand, the above breaches have not been cured by JRC.

140.    JRC's actions and wrongful conduct, as set forth herein, breached the express terms of the Employment and Severance Agreement as well as the covenant of good faith and fair dealing implied as a matter of law in such agreement.

141.    As a direct result of JRC's bad-faith and willful breaches of the Employment and Severance Agreement and the covenant of good faith and fair dealing implied therein, Thompson has suffered actual injury.

142.    By reason of the foregoing, Thompson is entitled to recover compensatory damages for JRC's breaches of the Employment and Severance Agreement in an amount to be determined at trial, but believed to be not less than $3,500,000.00, together with interest at the maximum rate provided by law.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Third-Party Claim by Thompson Trust and Thompson as Trustee of the Thompson Trust for Breach of Contract Against USE)

143.    Thompson repeats and realleges all of the foregoing allegations as though fully set forth herein at length.

144.    Thompson, as Trustee of the Thompson Trust, and the Thompson Trust repeat and realleges all of the foregoing allegations as though fully set forth herein at length.

145.    As set forth more fully above, the USE By-laws govern USE and constitute a valid and enforceable agreement between USE and its shareholders (including the Thompson Trust).

146.    As is also set forth more fully above, the By-Laws impose obligations, requirements, and/or duties upon USE to, among other things, pay dividends or make other

distributions on the outstanding shares or to all shareholders that are declared by its board.

147.    Thompson is not in breach of the USE By-laws, and has performed her obligations under this agreement for the benefit of USE.

148.    The USE By-laws require declared dividends to be paid *pro rata* to all shareholders. Section 7.7 of the USE By-laws provides in relevant part, that subject to the provisions of USE's Certificate of Incorporation and the law, the USE Board "may declare and pay dividends or make other distributions on the outstanding shares in such amounts and at such time or times as, in its discretion, the condition of the affairs of [USE] shall render advisable."

149.    There can be no preference or discrimination among the stockholders in the payment of dividends.  No provision of the USE By-laws permits USE to withhold paying distributions or dividends to a shareholder, or to offset any declared distribution or dividend.

150.    Section 8.1 of the USE By-Laws also provide for indemnification of Thompson if she is a "party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding…by reason of the fact that [s]he is or was a director or officer of the Corporation."

151.    As is set forth more fully above, USE breached its By-Laws, including the covenant of good faith and fair dealing implicit in such agreement by, among other things: failing and/or refusing to indemnify Thompson's attorneys' fees and costs in connection with this lawsuit; declaring and paying several hundred thousand dollars of dividends to all of the shareholders of USE other than the Thompson Trust; unilaterally choosing not to pay one shareholder – the Thompson Trust – its pro rata share of hundreds of thousands of dollars of USE dividends or make distributions from 2020 through July 2023; not to even notify Thompson or the Thompson Trust that USE was paying at least seven dividends or distributions to all of the other shareholders of USE; paying the Thompson Trust less than Thompson Trust's *pro rata* share of its USE dividends

into Norris McLaughlin's escrow account; failing and/or refusing to pay interest on the hundreds of thousands of dollars of USE dividends or distributions wrongfully withheld from 2020 through July 2023; issuing Form 1099-DIV to the IRS for the years 2020, 2021, 2022, and 2023, certifying that several hundred thousand dollars of dividends were paid to and received by the Thompson Trust – despite the fact that none of these funds had been received or paid to Thompson or the Thompson Trust; failing and/or refusing to provide – much less timely provide – the aforementioned 1099s to Thompson; and causing Thompson to be fined, issued levies, penalties, and accrued interest by the IRS and FTB because USE (by and through the Westphals) issued Form 1099-DIV documents to the IRS for the 2020, 2021, 2022, and 2023 years certifying that several hundred thousand dollars of dividends were paid to and received by the Thompson Trust – despite the fact that none of these funds had been received or paid to Thompson or her Trust until July 14, 2023.

152.    Despite due demand, the above breaches have not been cured by USE.

153.    USE's actions and wrongful conduct, as set forth herein, breached the express terms of the USE By-Laws as well as the covenant of good faith and fair dealing implied as a matter of law in such agreement.

154.    As a direct result of USE's bad-faith and willful breaches of its By-Laws and the covenant of good faith and fair dealing implied therein, Thompson, as Trustee of the Thompson Trust, and the Thompson Trust have suffered actual injury.

155.    By reason of the foregoing, Thompson, as Trustee of the Thompson Trust, and the Thompson Trust are entitled to recover compensatory damages for USE's breaches of its By-Laws in an amount to be determined at trial, but believed to be not less than $2,500,000.00, together with interest at the maximum rate provided by law.

## AS AND FOR A THIRD CAUSE OF ACTION

**(Third-Party Claim by Thompson for
Breach of Contract against USE)**

156.    Thompson repeats and realleges all of the foregoing allegations as though fully set forth herein at length.

157.    As set forth more fully above, the Debentures constitute a valid and enforceable agreement between USE and Thompson, individually and as the trustee of her mother's estate.

158.    As is also set forth more fully above, the Debentures impose obligations, requirements, and/or duties upon USE to, among other things, pay principal and interest to Thompson, individually and as the trustee of her mother's estate.

159.    Thompson is not in breach of the Debentures, and has performed her obligations under same.

160.    Each Debenture promises to pay the holder "the principal sum of THREE HUNDRED THOUSAND DOLLARS ($300,000.00), together with interest."

161.    Each Debenture also states that the "rate at which interest shall accrue and be paid on each Payment Date shall be twelve percent (12%) per annum."

162.    As is set forth more fully above, USE breached the Debentures, including the covenant of good faith and fair dealing implicit in such agreement, by failing and/or refusing to pay the entire principal and interest due.

163.    Despite due demand, the above breaches have not been cured by USE.

164.    USE's actions and wrongful conduct, as set forth herein, breached the express terms of the Debentures as well as the covenant of good faith and fair dealing implied as a matter of law in such agreement.

165.    As a direct result of USE's bad-faith and willful breaches of the Debentures and the

covenant of good faith and fair dealing implied therein, Thompson, individually and as the trustee of her mother's estate, has suffered actual injury.

166.    By reason of the foregoing, Thompson, individually and as the trustee of her mother's estate, is entitled to recover compensatory damages for USE's breaches of the Debentures in an amount to be determined at trial, but believed to be not less than $400,000.00, together with interest at the maximum rate provided by law.

## **AS AND FOR A FOURTH CAUSE OF ACTION**

### **(In the Alternative, Counterclaim by Thompson for Unjust Enrichment Against JRC and USE)**

167.    Thompson repeats and realleges all of the foregoing allegations as though fully set forth herein at length.

168.    As set forth more fully above, JRC has received a benefit from Thompson in the form of services provided by Thompson under the Employment and Severance Agreement, but JRC has not compensated or fully paid Thompson for this benefit in violation of such agreement.

169.    JRC has been unjustly enriched by this benefit, which has had a detrimental impact on Thompson, as Thompson has been denied the benefit of payments and funds owed to her.

170.    As set forth more fully above, USE has received a benefit from Thompson in connection with the Debentures, but has not compensated or fully paid Thompson for this benefit in violation of such agreement.

171.    USE has been unjustly enriched by this benefit, which has had a detrimental impact on Thompson, as Thompson has been denied the benefit of payments and funds owed to her.

172.    Accordingly, both JRC and USE have been unjustly enriched by virtue of their acts.

173.    If, as set forth in the TAC, the Employment and Severance Agreement is void, the shareholders of USE have benefitted as the value of their shares are higher today than they would

have been had Thompson not her personal assets at risk and entered a personal guaranty for necessary financing for USE and JRC, and USE and JRC did not emerge from Bankruptcy. Retention of that benefit without payment to Thompson would be unjust.

174.    If, as set forth in the TAC, the Employment and Severance Agreement is void, Thompson is entitled to compensation from the USE shareholders in an amount of the current shareholder value minus whatever such shareholder value would have been if USE and JRC did not emerge from the Bankruptcy.

175.    As set forth more fully above, JRC and USE have engaged in wrongful conduct by reneging on their assurances, promises, representations, and/or agreement to pay Thompson the amounts owed to her, together with interest.

176.    It is repugnant to the principles of good conscience and equity to permit JRC and USE to retain Thompson's compensation and funds.

177.    In the alternative, Thompson is entitled to restitution from JRC and USE in an amount to be determined at trial, but which is believed to be not less than $5,900,000.00, together with interest at the maximum rate provided by law.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Third-Party Claim by Thompson for Declaratory Judgment For Indemnification Against USE and JRC)

178.    Thompson repeats and realleges all of the foregoing allegations as though fully set forth herein at length.

179.    As is more fully set forth above, and actual and justiciable controversy has arisen and now exists between Thompson and USE and JRC concerning whether Thompson should be reimbursed and/or indemnified for her attorneys' fees incurred in connection with this litigation and other actions commenced in connection with Thompson's performance of her duties under the

Employment and Severance Agreement.

180.    Thompson is entitled to recovery of her attorneys' fees and costs pursuant to:

a.    The Bankruptcy Court Order in Aid of Confirmation of Plan provides: "None of the officers, directors, shareholders, representatives or agents of the [USE Entities] or their officers, directors or shareholders shall have any liability relating to, or arising from, the [USE Entities] entry into the Loan, Credit Facility, or the Guarantor Arrangement or the terms of the foregoing, except as expressly set forth in the documents evidencing the Loan, Credit Facility, or the Guarantor Arrangement."

b.    The Employment and Severance Agreement Section 3.04 provides: "[USE] shall also indemnify, defend, save and hold [Thompson] harmless from any liabilities, costs, claims, suits or other charges including (but not limited to) reasonable legal fees that [Thompson] incurs or incurred if [Thompson] is sued or threatened with suit to the greatest extent permitted by law."

c.    The provisions of N.J.S.A. 14A:3-5 and 42:2C-38(c).

d.    The provisions of Delaware Law 8 *Del. C.* § 145.

e.    Article 8 of the USE Bylaws provides: "The Corporation shall indemnify any person who was or is a party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding whether civil, criminal, administrative or investigative by reason of the fact that he is or was a director or officer of the Corporation, or of any other corporation which he served as such at the request of the Corporation, against all expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct

was unlawful, and to the fullest extent and in the manner set forth in and permitted by the Delaware Corporation Law and any other applicable law, as from time to time in effect. Such right of indemnification and advancement of expenses as provided herein shall not be deemed exclusive of any other rights to which such director or officer may be entitled apart from the foregoing provisions.

181.    Thompson contends she is owed in excess of $2 million in unreimbursed attorneys' fees and costs pursuant to: (i) the Employment and Severance Agreement; (ii) the By-laws of both JRC and USE; and (iii) court orders from the Bankruptcy Court.

182.    JRC and USE contend that Thompson has no right to her attorneys' fees and costs pursuant to: (i) the Employment and Severance Agreement; (ii) the By-laws of both JRC and USE; and (iii) court orders from the Bankruptcy Court.

183.    Thompson repeatedly has demanded that JRC and USE advance and indemnify Thompson for her attorneys' fees and costs she has incurred and continues to incur in connection with this litigation and other actions commenced by the Westphals and/or JRC relating to Thompson's alleged conduct during the time she was president of JRC.

184.    JRC and USE repeatedly have refused to pay Thompson's legal fees and costs.

185.    Accordingly, an actual and justiciable controversy has arisen and now exists between the parties, which requires the intervention of this Court to declare the rights of the parties.

186.    By reason of the foregoing, Thompson is entitled to a declaratory judgment, declaring that she is entitled to the advancement, reimbursement, and/or indemnification of all attorneys' fees, costs, and expenses incurred by her in connection with this action and the consolidated action.

## AS AND FOR A SIXTH CAUSE OF ACTION

**(Counterclaim by Thompson for Declaratory Judgment against JRC)**

187.    Thompson repeats and realleges all of the foregoing allegations as though fully set forth herein at length.

188.    As is more fully set forth above, and actual and justiciable controversy has arisen and now exists between Thompson and JRC concerning whether: (i) Thompon's corporate or business related expenses and payments should be reimbursed; and (ii) JRC will withdraw its baseless threats and claims of wrongdoing against Wells Fargo, in order for Wells Fargo to dissolve the freeze on Thompson's personal funds.

189.    Section 3.02 of the Employment and Severance Agreement provides for the reimbursement to Thompson of her out-of-pocket corporate expenses.

190.    Thompson has expended significant sums in out-of-pocket expenses in furtherance of and in connection with the performance of her duties and obligations under the Employment and Severance Agreement, including making credit card payments for JRC corporate credit cards, which have not been reimbursed.

191.    Thompson contends that all expenses incurred in connection with her tenure as president of JRC and/or the Employment and Severance Agreement were corporate or business related.

192.    JRC contends that the vast majority of expenses incurred by Thompson in connection with her tenure as president of JRC and/or the Employment and Severance Agreement were not corporate or business related.

193.    In correspondence from April 2020 through May 2021, the Westphals and Norris McLaughlin, purporting to act on behalf of JRC, made false and unsubstantiated assertions to

Wells Fargo that funds in the WF Account belong to JRC and threatened to commence legal process against Wells Fargo.  As a direct consequence of these baseless threats, Wells Fargo placed a freeze on Thompson's personal funds in the WF Account to protect itself from being sued.

194.     In May and June 2023, JRC was directed to "dissolve the 'freeze' placed on the personal account(s) of Dawn Thompson."  JRC and Norris McLaughlin wrongfully failed and/or refused to do so, and to date they wrongfully have refused to withdraw their demand and threat of legal action against Wells Fargo.

195.     Thompson contends that JRC has no right to freeze or cause the freeze of her personal funds in the WF Account.

196.     JRC (by and through the Westphals and Norris McLaughlin) contends that it has the right to freeze or cause the freeze of her personal funds in the WF Account.

197.     Thompson contends that JRC had no right to pay the legal fees of the Westphals.

198.     JRC contends that it had the right to pay the legal fees of the Westphals.

199.     Accordingly, an actual and justiciable controversy has arisen and now exists between the parties, which requires the intervention of this Court to declare the rights of the parties.

200.     By reason of the foregoing, Thompson is entitled to a declaratory judgment, declaring that: (i) expenses incurred in connection with her tenure as president of JRC and/or the Employment and Severance Agreement were corporate or business related, and therefore should be paid or reimbursed; (ii) JRC (by and through the Westphals and Norris McLaughlin) does not have the right to cause the freeze of her personal funds in the WF Account, and should withdraw their threats and claims of wrongdoing against Wells Fargo causing the freeze; and (iii) all legal fees paid by JRC (and/or USE) to Norris McLaughlin should be disgorged.

## AS AND FOR A SEVENTH CAUSE OF ACTION

**(Third-Party Derivative Claim on behalf of USE and JRC
by Thompson Trust and Thompson as Trustee of the Thompson Trust
for Breach of Fiduciary Duty Against the Westphals)**

201.    The Thompson Trust and Thompson as Trustee of the Thompson Trust repeat and reallege all of the foregoing allegations as though fully set forth herein at length.

202.    The Westphals, as purported officers, directors, and owners of a majority of USE's voting power through their trusts, and/or due to their exercise of actual control over JRC's and USE's affairs, owe fiduciary duties, including the duty of loyalty, good faith, a duty not to engage in self-dealing, a duty of fairness and honesty, and a duty of full disclosure and fair dealing.

203.    Among other things, these duties require the Westphals to refrain from self-dealing or discriminating against other shareholders, and to act at all times in the best interests of USE and JRC and not to abuse their position of trust and authority to benefit themselves or injure other shareholders.

204.    At all relevant times, the Thompson Trust was and remains a shareholder of USE.

205.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

206.    USE is the sole shareholder of JRC, its wholly-owned subsidiary.  Jim and Scott are the only individuals acting as directors of JRC and USE.

207.    Any demand on the USE Board and the JRC Board would be futile because the Westphals are the only individuals acting as directors and officers of USE and JRC, and their inherent and uncurable conflicts of interest render them incapable of making an impartial decision about whether to bring suit to redress the wrongs alleged more fully herein.

208.    Nonetheless, Thompson and Thompson Trust served a letter on USE and JRC, dated September 26, 2025, demanding that: (i) the USE Board bring suit on behalf of USE against the Westphals for their breaches of fiduciary duties owed to USE in their capacity as directors and officers of USE; and (ii) on behalf of USE (which is the sole shareholder of JRC), that the JRC Board bring suit bring suit on behalf of JRC against the Westphals for their breaches of fiduciary duties owed to JRC in their capacity as directors and officers of JRC.

209.    Accordingly, Thompson and the Thompson Trust have standing to bring these claims derivatively on behalf of USE, and derivatively on behalf of JRC.

210.    As set forth more fully above, in committing multiple acts of misconduct, the Westphals breached their fiduciary duties to JRC and USE by, among other things: (i) engaging in self-dealing to benefit themselves by declaring dividends or making distributions and only paying themselves, their trusts, and/or their children's trusts, to the detriment of Thompson Trust; (ii) declaring and paying dividends or making distributions to all shareholders other than Thompson's Trust on USE's outstanding shares in amounts and at times that they decided after they wrongfully wrested control over USE and JRC; (iii) wrongfully failing and/or refusing to even notify Thompson or her Trust of USE's payment of at least six quarterly dividends or distributions to all of the other shareholders of USE since the first quarter of 2021; (iv) wrongfully failing and/or refusing to direct payment of dividends and/or distributions to Thompson's Trust so that such dividends/distributions are received by Thompson's Trust, thereby discriminating against Thompson and her Trust and acting in bad faith; (v) wrongfully diverting the payment of a portion of Thompson's Trust's pro rata share of dividends and/or distributions to the escrow account of their personal counsel Norris; (vi) wrongfully directing their personal counsel Norris not to release any portion of Thompson's Trust's pro rata share of dividends and/or distributions to either the

Trust or to Thompson on behalf of the Trust; (vii) wrongfully directing Mahony to issue a Forms 1099-DIV relating to Thompson's Trust for a dividend or distribution– despite knowing that Thompson's Trust never has been paid and received any such dividend or distribution; (viii) repeatedly falsely certifying (either themselves or on behalf of USE) under penalty of perjury to the Internal Revenue Service that Thompson's Trust had received and been paid and received dividends or distributions in amounts greater than $100,000, knowing and intending that such would be declared and/or taxed as income to Thompson and the Thompson Trust; and (ix) wrongfully placing Thompson and/or her Trust in a position of being exposed to tax liability, penalties and interest by the Internal Revenue Service on funds that the Westphals directed not to be paid, released to, and/or received by Thompson's Trust and which were wrongfully concealed by Norris.

211.    The Westphals participated in these acts of mismanagement, or acted in reckless disregard of the facts known to them, and engaged in and/or failed to exercise due care to prevent the imprudent and wrongful transactions referred to above.

212.    The Westphals further breached their fiduciary duties to JRC and/or USE including, but not limited to, the following: (1) refusing to agree to pay certain debentures/corporate debts owed by USE, and causing such debentures to accrue additional interest against the best interest of USE; (2) paying themselves over $100,000 in unearned and unwarranted compensation; (3) using corporate funds to finance this vendetta lawsuit against Thompson, resulting in corporate waste and increased liabilities to JRC and USE; (4) converting the funds in the FirstBank account, believed to be in excess of $1 million, for their own personal use and to make improper distributions to themselves; (5) breaking into Thompson's personal storage unit, stealing Thompson's Car, selling Thompson's Car, and pocketing the proceeds of that sale, despite the fact

that JRC was obligated to turn title of Thompson's Car over to Thompson at the time of her separation from JRC; (6) pursuing and bringing this action without authorization, and not in the interests of JRC or USE, but instead as a vendetta against their sister.

213.   As set forth more fully above, the actions and conduct of the Westphals demonstrate a willful, wanton, and reckless disregard of their fiduciary duties to USE and JRC.

214.   By reason of the foregoing, USE and/or JRC are entitled to recover compensatory damages for the Westphals' breaches of their fiduciary duties in an amount to be determined at trial, but believed to be not less than $2,500,000.00, together with interest at the maximum rate provided by law.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

**(Third-Party Claim by Thompson for
Tortious Interference with Contract against the Westphals)**

215.   Thompson repeats and realleges all of the foregoing allegations as though fully set forth herein at length.

216.   The Bankruptcy Court and both the USE and JRC Boards approved the terms of the Guarantor Arrangement and the Employment and Severance Agreement.

217.   Thompson had and has a reasonable expectation of current and prospective economic advantage under the Employment and Severance Agreement, including current and post-termination compensation and benefits.

218.   As set forth more fully above, the Westphals (individually and through their personal counsel Norris McLaughlin) breached such agreement by preventing Thompson from receiving the benefits, compensation, and funds due to her under the Employment and Severance Agreement.

219.    The Westphals (individually and through their personal counsel Norris McLaughlin) breached the Employment and Severance Agreement by causing JRC to take the position that it had terminated such agreement.

220.    The Westphals (individually and through their personal counsel Norris McLaughlin) breached the Employment and Severance Agreement by constraining Thompson to terminate such agreement for "Good Reason."

221.    The Westphals (individually and through their personal counsel Norris McLaughlin) wrongfully and improperly have declared the Employment and Severance Agreement void.

222.    As set forth more fully above, the Westphals' (individually and through their personal counsel Norris McLaughlin) interference with the Employment and Severance Agreement was malicious, vindictive, intentional, and without any justification or excuse.

223.    As a direct result of the Westphals' bad-faith and willful breaches of the Employment and Severance Agreement, Thompson has suffered actual injury.

224.    By reason of the foregoing, Thompson is entitled to recover compensatory damages for the Westphals' tortious interference with the Employment and Severance Agreement in an amount to be determined at trial, but believed to be not less than $3,500,000.00, together with interest at the maximum rate provided by law.

## AS AND FOR A NINTH CAUSE OF ACTION

**(Third-Party Claim by Thompson for
Fraud on the Court Against the Westphals)**

225.    Thompson repeats and realleges all of the foregoing allegations as though fully set forth herein at length.

226.    As set forth more fully above, the Westphals have perpetrated a fraud on the Court by engaging in intentional, deceitful acts that corrupted the integrity of the judicial process and substantially interfered with the administration of justice.

227.    The Westphals orchestrated a deceitful scheme to coerce Thompson to renounce her employment and severance rights and authorize unwarranted payments to the Westphals by engaging in fraudulent litigation conduct, including, critically, engaging Norris McLaughlin to file the underlying complaint in this action on behalf of JRC and USE at a time when the Westphals knew that they were not officers, directors or board members of those entities and did not have the authority to act on their behalf.

228.    On April 3, 2020 – three days <u>before</u> the April 6 annual stockholder meeting – Norris McLaughlin, purporting to act as counsel for JRC and as counsel for the Westphals, improperly commenced this action against Thompson – despite the fact that Offit Kurman was JRC's counsel at that time.

229.    On April 6, 2020 – three days after Norris McLaughlin filed this lawsuit – USE allegedly held the Sham Meeting following a Sham Meeting Notice. The Sham Meting Notice stated that such "meeting" was to be considered the "annual meeting," the purpose of which is to elect directors.

230.    The Sham Meeting Notice was signed by SKW Trust as Stockholder, JJW Trust as Stockholder, and Scott as Director.  However, under USE's By-Laws, the annual meeting of stockholders for the election of directors can only "be called by the President or Board of Directors."  From August 16, 2010 through April 6, 2020:

- Thompson was the sole board member of JRC and a member of the USE Board;

- The Westphals were not board members of JRC or USE;

- The Westphals were not officers or directors of JRC or USE; and

- Offit Kurman – not Norris McLaughlin – was JRC's corporate counsel until it was allegedly terminated by the Westphals on April 6, 2020.

231. At the April 6, 2020 meeting (three days *after* this action was commenced by JRC and the Westphals), the Westphals through proxies and entities they owned or controlled, "voted to remove the then-current directors of USE and to elect Scott and Jim to be the directors of U.S. Eagle."

232. Following the April 6 Meeting, USE, as sole shareholder of JRC and acting through its newly appointed officers (the Westphals), acted by written consent to remove all then-current directors of JRC and to appoint Scott and Jim as directors of JRC.

233. Thereafter, on May 26, 2020, JRC and the Westphals filed the FAC, despite knowing that they had no authority to do so and, in the process, made knowingly false representations to the Court and otherwise engaged in a knowing and intentional act to deceive the court that it had authority to file the FAC.

234. The Westphals' knowingly false representations and/or intentional withholding of critical facts prevented the Court from performing its impartial duty, include, but are not limited to:

a.    that they had authority to file the FAC and were acting on behalf of JRC when they knew they had no authority to file a complaint and pursue litigation on behalf of JRC and USE, but nevertheless represented to the Court that they did.  This act of fraud on the Court directly caused Thompson unnecessarily to spend over $2 million in legal fees as well as the unnecessary use of substantial judicial resources.

b.    Even after being provided evidence that the basis of the OTSC was patently false, and that the actual deadline was May 6, 2021, the Westphals did not inform the Court or withdraw portions of a sworn declaration asserting this false fact.

d.    The FAC, SAC, and TAC allege that Thompson "concocted a self-enrichment scheme" and intentionally withheld facts from the directors and stockholders of USE in the parties' entry to the Employment and Severance Agreement. However, USE and JRC's directors were fully aware of and approved the Guarantor Arrangement and Employment and Severance Agreement, which the Westphals willfully withheld from the Court.

e.    The TAC alleges that the Employment and Severance Agreement is void and unenforceable, but Jim has acknowledged the validity of the Employment and Severance Agreement in communications with Thompson, another fact concealed from the Court.

235.    As set forth more fully above, the Westphals have been and are subverting the integrity of the judicial process and interfering with the judicial system's ability to impartially adjudicate this matter, with Thompson suffering serious financial losses as a result.

236.    By reason of the foregoing, Thompson is entitled to a judgment striking the Westphals' (individually as well as by and through JRC) pleadings, entering a default judgment against the Westphals, and/or terminating the proceedings in favor of Thompson, together with an award of Thompson's attorneys' fees, costs and disbursements incurred as a result of the Westphals' fraud on the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Thompson and Thompson Trust respectfully demand that judgment be entered against the Counterclaim Defendants and the Third-Party Defendants as follows:

A.     On the First Cause of Action, awarding Thompson compensatory damages for JRC's breaches of the Employment and Severance Agreement in an amount to be determined at trial, but believed to be not less than $3,500,000.00, together with interest at the maximum rate provided by law;

B.     On the Second Cause of Action, awarding Thompson, as Trustee of the Thompson Trust, and the Thompson Trust compensatory damages for USE's breaches of its By-Laws in an amount to be determined at trial, but believed to be not less than $2,500,000.00, together with interest at the maximum rate provided by law;

C.     On the Third Cause of Action, awarding Thompson, individually and as the trustee of her mother's estate, compensatory damages for USE's breaches of the Debentures in an amount to be determined at trial, but believed to be not less than $400,000.00, together with interest at the maximum rate provided by law;

D.     On the Fourth Cause of Action, in the alternative, awarding Thompson restitution from JRC and USE in an amount to be determined at trial, but which is believed to be not less than $5,900,000.00, together with interest at the maximum rate provided by law;

E.     On the Fifth Cause of Action, for declaratory judgment, declaring that Thompson is entitled to a declaratory judgment, declaring that she is entitled to the advancement, reimbursement, and/or indemnification of all attorneys' fees, costs, and expenses incurred by her in connection with this action and the consolidated action;

F.     On the Sixth Cause of Action, for declaratory judgment, declaring that: (i) expenses incurred in connection with her tenure as president of JRC and/or the Employment

and Severance Agreement were corporate or business related, and therefore should be paid or reimbursed; (ii) JRC (by and through the Westphals and Norris McLaughlin) does not have the right to cause the freeze of her personal funds in the WF Account, and should withdraw their threats and claims of wrongdoing against Wells Fargo causing the freeze; and (iii) all legal fees paid by JRC (and/or USE) to Norris McLaughlin should be disgorged.

G.    On the Seventh Cause of Action, awarding JRC and USE compensatory damages for the Westphals' breaches of their fiduciary duties in an amount to be determined at trial, but believed to be not less than $2,500,000.00, together with interest at the maximum rate provided by law;

H.    On the Eighth Cause of Action, awarding Thompson compensatory damages for the Westphals' tortious interference with the Employment and Severance Agreement in an amount to be determined at trial, but believed to be not less than $3,500,000.00, together with interest at the maximum rate provided by law;

I.    On the Ninth Cause of Action, striking the Westphals' (individually as well as by and through JRC) pleadings, entering a default judgment against the Westphals, and/or terminating the proceedings in favor of Thompson, together with an award of Thompson's attorneys' fees, costs and disbursements incurred as a result of the Westphals' fraud on the Court;

J.    Disgorging any and all legal fees paid by USE and/or JRC to Norris McLaughlin;

K.    Awarding Thompson prejudgment and post judgment interest and the costs and disbursements of this action, including attorneys' fees incurred by Thompson and the Thompson Trust in connection with the underlying dispute and this action; and

L.    Granting such other and further relief as this Court deems just and proper.


Dated:  New York, New York
        September 29, 2025

                        **HAYNES AND BOONE, LLP**

                        _____
                        Gabriel Levinson
                        Joseph Lawlor (*Pro Hac Vice*)
                        Justin R. Bonanno (*Pro Hac Vice*)
                        Brian P. Matthews
                        30 Rockefeller Plaza, 26th Floor
                        New York, New York 10112

                        *Attorneys for Dawn E. Thompson and the*
                        *Dawn Thompson Trust*

69

## VERIFICATION

I, Dawn E. Thompson, in my individual capacity and as trustee of the Dawn Thompson Trust, hereby certify that I have read the allegations contained in the foregoing DAWN E. THOMPSON'S ANSWER AND AFFIRMATIVE DEFENSES TO JULIUS REALTY CORPORATION'S THIRD AMENDED COMPLAINT, DAWN E. THOMPSON'S COUNTERCLAIMS AND THIRD-PARTY CLAIMS, AND DAWN E. THOMPSON'S, AS TRUSTEE OF THE DAWN THOMPSON TRUST, AND DAWN THOMPSON TRUST'S THIRD-PARTY CLAIMS, and that said allegations are true to the best of my personal knowledge. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.


Dated: September 29, 2025


_____
DAWN E. THOMPSON